See dissenting opinion of PROVOSTY, J., 64 South. 890.

---

(64 South. 891.)

No. 19,674.

HUDSPETH et al. v. PRODUCERS' OIL CO. et al.

(March 30, 1914.)

*(Syllabus by the Court.)*

1. MINES AND MINERALS (§ 58*) — LEASE — CURE OF DEFECT.

Where, in a mineral lease, it was stipulated that, if the lessee should fail to commence operations within the term of 24 months, then the lessor should have the privilege of declaring the lease null and void by giving written notice to the lessee, subject to the right of the lessee to the continuance of the oil and mineral rights granted by the contract, by the payment to the lessor of rental at the rate of 50 cents per annum per acre, until such time as said operations shall have been begun. *Held* that, while such a lease may have been potestative in the beginning, such defect was cured by the commencement of the work by the lessee at the instance and request of the lessor.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 168, 169; Dec. Dig. § 58.*]

2. MINES AND MINERALS (§ 64*) — LEASE — RIGHTS OF ASSIGNEE.

*Held,* further, that assignees of the lessor, after the commencement of such operations by the lessee, stand in the shoes of the lessor, as the law does not require a registry of the action of the parties under a recorded agreement.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 181–184; Dec. Dig. § 64.*]

Appeal from Sixteenth Judicial District Court, Parish of Evangeline; B. H. Pavy, Judge.

Action by Mrs. Emily A. Hudspeth and others against the Producers' Oil Company and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

E. P. Veazie and R. Lee Garland, both of Opelousas, J. S. Wheless, of Beaumont, Tex., and Thigpen & Herold, of Shreveport, for appellants. Farrar, Jonas, Goldsborough & Goldberg, of New Orleans, E. B. Dubuisson, of Opelousas, Hampden Story, of Shreveport, and Caffery, Quintero, Gidiere & Brumby, of New Orleans, for appellees.

LAND, J. The petition alleged that Mrs. Emily A. Hudspeth and Miss Leila Hudspeth had been for many years owners of an undivided one-half interest in and to a certain tract of land in the parish of Evangeline, being the S. ½ of the N. W. ¼ and the N. W. ¼ of the S. W. ¼ of section 35, township 3 S., range 1 W. The petition further alleged that the said Hudspeths on March 6, 1912, sold to their coplaintiffs, J. C. Wilson and W. B. Tucker, an undivided interest in and to the N. ½ of the S. ½ of the N. W. ¼ of said section 35 for the consideration of $5,000 in cash, and $12,000 to be paid by the purchasers out of 50 per cent. of the oil and other minerals produced from the premises.

The petition further alleged that the said Hudspeths on March 7, 1912, leased for development of oil and gas to said Wilson and Tucker the undivided one-half interest in

and to the S. ½ of the S. ½ of the N. W. ¼ and the N. W. ¼ of the S. W. ¼ of section 35 aforesaid.

The petitioners alleged that the other undivided one-half interest in and to the 120 acres above described was owned by the Le Danois Land & Stone Company of the parish of Orleans, which had executed a mineral lease of the said interest to the Myles Mineral Company of said parish; that all the land adjoining the said 120 acres on the south and east was owned absolutely by the said Le Danois Land & Stone Company, which had leased the same to the said Myles Mineral Company, which had subleased a portion of said land to the Producers' Oil Company of Texas.

The petitioners further alleged that the Myles Mineral Company had recently under its said lease completed a producing well upon the S. W. ¼ of the N. E. ¼ of said section 35, within a very short distance of the lines of the property in which the petitioners owned an interest as aforesaid; and that said oil well was then flowing large quantities of oil daily; and that one T. C. Bass and said Producers' Oil Company, under some arrangement with the Myles Mineral Company, were drilling a well in search for oil and gas in the N. E. ¼ of said section within a few feet of petitioners' said property; and that they and other persons were making preparations to drill other wells adjacent to the lines of said property.

Petitioners further alleged that, to protect the land in which they were interested from drainage by wells on adjacent lands, it was necessary that a number of wells be drilled on the said 120 acres along and in proximity to the eastern and southern boundary of said tract; that the petitioners were in possession of the said 120 acres of land, but not claiming exclusive possession of the same, conceding the right of their co-owners to the like possession; and that your petitioners, Wilson and Tucker, had commenced to erect a derrick thereon for the purpose of exercising their right to drill for oil and gas, for the benefit not only of themselves but for their co-owners.

The petition further alleged that the three defendant companies were interfering with the petitioners in their operations for drilling on the land, and were threatening to prevent petitioners and other employés from exercising their said rights on the premises by threat and show of force.

Petitioners prayed for writs of injunction restraining and prohibiting the defendants from interfering with, molesting, hindering, or preventing in any way the drilling and operations of said Wilson and Tucker upon the said property; and that after legal notices and delays for judgment perpetuating said injunction.

Defendants filed a rule on the plaintiffs to show cause why the injunction should not be dissolved on several grounds, among others that the Myles Mineral Company, at the time of the issuance of said injunction, was in possession of the property sued for under a valid lease from Mrs. and Miss Hudspeth, and that said Wilson and Tucker were well acquainted with the existence of said lease before they made the purchase and lease referred to in the petition; and that at the same time the Producers' Oil Company, under a sublease from the Myles Mineral Company and said company, were drilling wells on said premises; and that on or about March 27, 1912, the plaintiffs took surreptitious possession of a piece of said land about 24 feet square, against the warning and protest of the company aforesaid, and have since maintained said possession by armed violence; and that only one producing well was drilled on the adjoining property, and, before any oil was taken therefrom for commercial purposes, two wells had been begun on the land in controversy. The rule was referred to the mer-

its. Thereupon the defendant excepted that the plaintiffs could not attack collaterally the said lease from the Hudspeths to the Myles Mineral Company under which the defendants were in possession of the premises.

Defendants, after pleading the general issue, averred that they claimed and held possession of the premises by valid leases from Mrs. and Miss Hudspeth and the Le Danois Land & Stone Company; that they sank eight wells in proximity to the tract in controversy before they found oil on February 4, 1912, and the eighth well was capped and not opened until the latter part of February, 1912, when it showed a flow of about a thousand barrels a day, which has constantly decreased; and that while well No. 8 was boring, and shortly before the discovery of oil therein, the Myles Mineral Company, at the solicitation of the plaintiffs, promised that the next well should be bored on the property in dispute, with which promise the plaintiffs expressed themselves as entirely satisfied; that in accordance with this promise the said company on February 19, 1912, and before No. 8 was opened, selected a spot to drill a well on the premises in dispute, and commenced operations thereon to clear the land and to erect a derrick, and prosecuted said work diligently, and was so engaged in March 3, 1912, when the Hudspeths notified the said company that said lease was not binding and was terminated; whereupon said company made to the said plaintiffs tender of the sum required by said lease to keep the same in effect, which tender the said plaintiffs refused. Defendants in their answer reiterated the averments of their rule as to the alleged trespass on the premises by the said Wilson and Tucker.

Defendants prayed that the injunction be dissolved and the plaintiffs' demand be rejected with costs, reserving to said plaintiffs the right to contest if they so desired, the lease of said property by the Hudspeths to the Myles Mineral Company in a direct action; and for $1,000 for counsel fees, and costs.

There was judgment in favor of the defendants dissolving the injunction, and rejecting plaintiffs' demand, and also for $500, and costs to be taxed. Plaintiffs appealed.

[1] This suit was instituted on April 5, 1912. The petition ignored the lease from Mrs. and Miss Hudspeth to the Myles Mineral Company, treating the same as a nullity.

The lease was executed on the 10th day of April, 1909, and was duly recorded in the parish of St. Landry on May 24, 1909. Under the terms of the contract the lessee was to commence operations on the tract by drilling, boring, or mining for oil within 24 months from the date thereof. It was further stipulated as follows:

"In case the said parties of the second part shall fail to commence operations within the said term of twenty-four months, or shall suspend the same thereafter for as much as six months at any time, save for causes beyond their control, then the party of the first part shall have the privilege of declaring this lease null and void thereafter, by giving written notice to the parties of the second part, subject to the right of said parties of the second part to the continuance of the oil and mineral rights herein granted, by the payment to the said party of the first part of rental at the rate of fifty cents per annum per acre, until such time as said operations shall have been begun or resumed."

The 24 months expired on April 10, 1911. On March 2, 1912, Mrs. and Miss Hudspeth mailed a letter to the Myles Mineral Company stating that the lease had expired by limitation, and that they would treat the same thenceforth "as a nudum pactum, null, void and of no effect."

On March 9, 1912, the Myles Mineral Company tendered to the Hudspeths the sum of $100 for rental for the month ending April 10, 1912, at the same time protesting that the lease had not terminated, and asserting that the lessee was and had been in possession of the premises boring wells for some

time prior to the receipt of the notice from the lessors. The evidence tends to show that the defendants on February 19, 1912, selected a location for a derrick on the tract in question, and commenced the work of clearing the ground, and that the first derrick was completed about March 12, 1912. Some time in March, 1912, Wilson and Tucker also commenced preparations for the erection of a derrick on the premises.

The lease in question may have been potestative in the beginning, but such a defect may be cured by subsequent voluntary performance by the lessees. After securing promise of speedy performance, and after the work had actually commenced, and after the discovery of oil on the adjacent premises by the operations of the lessee, the lessors gave notice that the lease was null and void.

Gen. Myles, the president of the company, testified that the Hudspeths frequently visited his office and inquired about the prospects of striking oil in well No. 8; that in December, 1911, he told Mrs. Hudspeth that as soon as he found oil he was going to put down a well on her land, "to which she expressed satisfaction"; that some time in January, 1912, Mrs. Hudspeth and her daughter came in again, when they carried on about the same conversation; that in February, 1912, a few days after the well was brought in, he met Mrs. Hudspeth in Carondelet street, told her the news, and that he had given instructions that, as soon as they opened the well, for the men to go on her land and dig a well there—to all of which she expressed gratification and thanked him for what he had done for her.

Mr. Journee, secretary and treasurer of the Myles Mineral Company, testified that Mrs. Hudspeth and her daughter were continually informed of the progress of the work on every well that was drilled; that when well No. 4 was drilled they were informed that if oil was struck the next well would be drilled on their land, and thereupon they expressed their appreciation and thanks; that a similar interview took place when well No. 5 was drilled; that in January, 1912, Mrs. Hudspeth, while well No. 8 was drilling and after evidence of oil had been found, offered to sell her land to the Myles Mineral Company, and the witness advised her not to sell under any circumstances, but to hold it and get benefit of the royalty.

The witness Babcock testified that he heard a conversation between Mr. Journee and Mrs. Hudspeth, just outside of the Hibernia Bank Building, on February 20, 1912; that Mr. Journee told Mrs. Hudspeth that a location had been made on her property and that the work had commenced.

Mrs. Hudspeth's testimony is vague and unsatisfactory. She did not remember everything that was said; did not remember conversations; the officers of the Myles Mineral Company continually promised that the next well would be on her land; on Mardi Gras of 1912, met Gen. Myles on Baronne street and congratulated him on his success; that he had worked so long and faithful; and he said he hoped that it would be a benefit to me.

Mrs. Hudspeth remembers having a conversation with Mr. Journee about February 20, 1912, but denies that he made any statement to her about being engaged in work on her land; had no recollection of any such statement; did not remember it at all. Mrs. Hudspeth testified that she did not know Wilson or Tucker on March 2, 1912, when she sent the notice to the Myles Mineral Company; met them afterwards.

The following extracts from the testimony of Mrs. Hudspeth shows that she made no objection to the continuance of the oil lease until after well No. 8 proved a gusher:

"Q. But you had no objection to the lease continuing, although he wasn't living up to his promises?

"A. I had lost the copy of the lease, and I

didn't know that the time had expired until I began to think seriously about it.

"Q. You began to think seriously about it after well No. 8 was drilled?

"A. Yes.

"Q. And after it had been found a gusher?

"A. Yes."

There can be no question on the evidence that the term of the lease was continued by the common consent of the parties in interest, and was by them treated as a live contract down to March 2, 1912. The testimony of Journee and Champion show that the Myles Mineral Company commenced work on the leased premises on February 19, 1912, for the purpose of erecting derricks thereon. Journee selected the location and ordered the work done, and saw its commencement. Champion did the work, which consisted of clearing up about 12 acres of land and sawing blocks for derricks. Champion continued this work until March 1, 1912, when he left. Subsequently a well was drilled on this and another location on the tract in question.

The commencement of this work satisfied the condition of the lease, and thereafter the lessors had no legal right to declare the contract a nullity. We also think that the tender of payment for delay was made in due time.

[2] The contention of Wilson and Tucker that they cannot be affected by the equities between the lessors and the lessee is without merit. The contract as recorded was notice to third persons of all of its stipulations. Whether the contract was subsequently executed or not was a matter en pais, which no law requires to be recorded. Hence a third person is necessarily put on inquiry as to the subsequent actions of the parties under a recorded agreement. Otherwise it might well happen that a debtor who had discharged all of his obligations to his creditor could not urge payment, discharge, or release, as against third persons.

Judgment affirmed.

MONROE, J., concurs in the decree.